1    GLENN W. TROST (State Bar No. 116203)
     gtrost@cblh.com
2    CONNOLLY BOVE LODGE & HUTZ LLP
     333 Grand Ave., Suite 2300
3    Los Angeles, CA 90071
     Telephone: (213) 787-2500
4    Facsimile: (213) 687-0498

5    JAMES P. WHITE (*pro hac vice*)
     james.white@huschblackwell.com
6    LAURIE HAYNIE (*pro hac vice*)
     laurie.haynie@huschblackwell.com
7    ARON CARNAHAN (*pro hac vice*)
     aron.carnahan@huschblackwell.com
8    HUSCH BLACKWELL LLP
     120 South Riverside Plaza, Suite 2200
9    Chicago, IL 60606
     Telephone: (312) 526-1612
10

11    SCOTT E. ROGERS (*pro hac vice*)
     srogers@scandagliaryan.com
12    SCANDAGLIA & RYAN
     55 E. Monroe, Suite 3440
13    Chicago, IL 60603
     Telephone: (312) 580-2020

14    Attorneys for Defendant and Counterclaimant Ty Inc.

15

16    **UNITED STATES DISTRICT COURT**

17    **CENTRAL DISTRICT OF CALIFORNIA**

18

| | |
|---|---|
| **AURORA WORLD, INC.,** | **Case No. CV-09-08463 MMM (Ex)** |
|            **PLAINTIFF,** | The Honorable Margaret M. Morrow |
|    **VS.** | **DEFENDANT TY INC.'S NON-CONFIDENTIAL STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT RELATING TO AURORA'S CLAIM FOR INDIRECT PROFITS** |
| **TY INC.,** | |
|            **DEFENDANT.** | |
| **AND RELATED COUNTERCLAIMS.** | Hearing:     Subject to court order<br>Time:         10:00 a.m.<br>Courtroom:   Roybal, Rm. 780 |

| Uncontroverted Material Fact | Supporting Evidence |
|---|---|
| **I.    DREWS' INITIAL REPORTS** | |
| 1.   During discovery, Ty asked Aurora to "[i]dentify all facts that support or tend to support Plaintiff's claims… that Plaintiff has been injured and sustained actual, pecuniary, or other damages as a result of Defendant's conduct …." | Ty's First Set of Interrogatories to Aurora World, Inc., Interrogatory No. 17 pp. 8-9, Ex. B. |
| 2.   After Aurora refused to answer Ty's interrogatory No. 17 concerning damages, Magistrate Judge Eick ordered Aurora to "respond fully" to this Interrogatory in response to Ty's motion to compel. | Order of June 21, 2010, p. 2 Docket No. 70. |
| 3.   Pursuant to the Court Order, Aurora responded (after objection):<br><br> "As discovery is ongoing, Aurora has not had the opportunity to obtain all facts that might support or tend to support its claims.  Aurora is in the process of analyzing the full extent of the damages caused by Ty's infringement of its products.  Aurora further responds that its damages were caused by, among other things, Ty's unlawful misappropriation of its intellectual property.  Aurora further responds that pursuant to Rule 33(d) of the Federal Rules of Civil Procedure, the answer to the portion of this Interrogatory calling for the identification of documents can be ascertained from the documents Aurora produced in response to Ty's First Request for Production of Documents.  Aurora further responds that the persons most knowledgeable about the substance of this Interrogatory are more easily ascertained by Ty, as the individuals with the most knowledge of Ty's willfulness and intent | Plaintiff Aurora World Inc.'s July 21, 2010 Supplemental Responses to Ty's Interrogatories, p. 29, Ex. C. |

| Uncontroverted Material Fact | Supporting Evidence |
|---|---|
| are likely Ty's employees and/or agents." | |
| 4. On October 18, 2010, Aurora served Ty with an Expert Report of David Drews (a purported expert witness on damages), in which Mr. Drews rendered an opinion as to the amount of unjust enrichment enjoyed by Ty; an alternative measure of damages based on a reasonable royalty; and the prospective advertising expenditures necessary to correct any inaccurate impressions in the marketplace. | Expert Report of David Drews dated October 18, 2010, pp. 2-3, Ex. E. |
| 5. On November 16, 2010, Aurora supplemented its answer to Interrogatory No. 17 and (after objection), stated the following:<br><br>"Aurora refers to the expert report of its damages expert, David Drews. Aurora further responds that its damages were caused by, among other things, Ty's unlawful misappropriation of its intellectual property. Aurora further responds that pursuant to Rule 33(d) of the Federal Rules of Civil Procedure, the answer to the portion of this Interrogatory calling for the identification of documents can be ascertained from the documents Aurora produced in response to Ty's First Request for Production of Documents as well as the documents Ty produced in response to Aurora's Requests for Production of Documents. Aurora further responds that the persons most knowledgeable about the substance of this Interrogatory are more easily ascertained by Ty, as the individuals with the most knowledge of Ty's willfulness and intent are likely Ty's employees and/or agents." | Plaintiff Aurora World's Amended Responses to Ty's Interrogatories Nos. 1, 2, 3, 5, 12, 13, 14, 15 and 17, dated November 16, 2010 p. 23, Ex. D. |

| Uncontroverted Material Fact | Supporting Evidence |
|---|---|
| 6.   On January 10, 2011, Aurora served Ty with the Supplemental Report of David Drews and Rebuttal of the Expert Report and Disclosure of Glenn A. Dalhart, in which he increased the previous amounts in all categories of damages/lost profits. | Supplemental Report of David Drews and Rebuttal of the Expert Report and Disclosure of Glenn A. Dalhart dated January 10, 2011, p. 2, Ex. F. |
| 7.   No further supplementations of this interrogatory answer were ever served by Aurora. | Haynie Dec. ¶ 6, Ex. A. |
| **II.      THIS COURT'S SUMMARY JUDGMENT RULING AND TY'S MOTION IN LIMINE** | |
| 8.   On March 14, 2011, this Court granted in part Ty's Motion for Summary Judgment, and ruled that Ty's accused Beanie Boos toys do not infringe the claimed copyrights in Aurora's YooHoo & Friends plush toys, with the exception of the Cleo and Bubblegum Beanie Boos, concerning which there is an issue of fact as to whether they infringe. | Order Granting in Part and Denying in Part Defendant Ty's Motion for Summary Judgment, Docket No. 162 p. 44. |
| 9.   Thereafter, on March 16, 2011, Ty filed a Motion *in Limine* No. 4 for an Order Excluding the Opinion of David Drews, because, among other things his opinion was based on the sale of Beanie Boo toys that were no longer part of this case after the Court's grant of summary judgment in favor | Defendant Ty Inc.'s Motion *In Limine* Number 4 for an Order Excluding the Opinion of David Drews, Docket No. 171. |

| Uncontroverted Material Fact | Supporting Evidence |
|---|---|
| of Ty. | |
| 10.  In response to Ty's Motion *in Limine* No. 4, Aurora claimed, for the first time, that it was entitled to seek profits that Ty indirectly earned as a result of its use of the allegedly infringing Cleo and Bubblegum dolls in marketing other Beanie Boo toys, and stated as follows:<br><br>"Mr. Drews' original report calculated the profits Ty earned on its sales of the entire line of Beanie Boos.  Based on the Court's summary judgment ruling, Mr. Drews will narrow his report to calculate the profits Ty earned during October and November 2009, when Ty booked orders which included Cleo and Bubblegum.  It was during that period that Ty filled orders that were booked while it was actively marketing Cleo and Bubblegum to its retailers.  Significantly, Mr. Drews will not rely upon new data or sales information. Instead, he will simply use a subset of the data he used in his original report.  Nor will Mr. Drews use a different methodology." | Plaintiff Aurora World, Inc.'s Opposition to Ty Inc.'s Motion *In Limine* No. 4 for an Order Excluding the Opinion of David Drews, Docket No. 194, p. 4. |
| 11. In reply, Ty argued that it was too late for Aurora to introduce a new theory of damages based on indirect profits, and that it would be prejudiced if it were forced to defend against this new damages theory with trial looming. | Defendant Ty Inc.'s Reply In Support of its Motion *In Limine* Number 4 for an Order Excluding David Drews' Opinion Testimony Based on Non-Infringing Sales and Reasonable Royalty, Docket No. 210, p. 6. |

| Uncontroverted Material Fact | Supporting Evidence |
|---|---|
| 12. On April 4, 2011, this Court issued its Order Regarding Ty's Motion *in Limine* to Exclude the Testimony of David Drews.  In its Order, the Court stated that Aurora asserted that "Drews is prepared to provide a supplemental report regarding the indirect profits to which Aurora is entitled as a result of Ty's alleged infringement of Cleo and Bubblegum" and that Aurora "notes that in formulating his supplemental report, 'Drews will not rely [] on new data or sales information.  Instead he will simply use a subset of the data he used in his original report.'  It also asserts that Drews will not 'use a different methodology.'" | Order Regarding Ty's Motion *in Limine* to Exclude the Testimony of David Drews, Docket No. 214 p. 2, quoting Drews' Opp. p. 4. |
| 13.  After reciting these facts, the Court directed Aurora to "serve a supplemental expert report from Drews stating his new opinion regarding Ty's indirect profits on or before Monday, April 11, 2011." | Order Regarding Ty's Motion *in Limine* to Exclude the Testimony of David Drews, Docket No. 214 p. 3. |
| **III.   MR. DREWS' APRIL 11, 2011 SUPPLEMENTAL REPORT** | |
| 14.  On April 11, 2011, Aurora served upon Ty the "Supplemental Report of Mr. Drews" containing "Ty Inc.'s Indirect Profits Analysis." | April 11, 2011 Supplemental Report of David Drews, Ex. G. |

| Uncontroverted Material Fact | Supporting Evidence |
|---|---|
| 15.  In his April 11, 2011 Supplemental Report, Mr. Drews rendered an opinion, for the first time, that "[t]here is a causal link between Ty's use of the Cleo and Bubblegum dolls and the generation of sales of the other six dolls making up the initial eight Beanie Boos included in the October 2009 launch." | April 11, 2011 Supplemental Report of David Drews p. 2, Ex. G. |
| 16.  The entirety of Mr. Drews' "causal link" analysis is found in one sentence in his report:  "While only a few Cleo and Bubblegum dolls have actually been sold in the U.S. (25 for Cleo and 13 for Bubblegum), Cleo and Bubblegum were used to help launch the Beanie Boos line and were fundamentally integrated into the marketing of the initial eight Beanie Boos." | April 11, 2011 Supplemental Report of David Drews p. 8, Ex. G. |
| 17.  In the "Background" section of his Supplemental Report, Mr. Drews cited facts and data not contained in his previous reports, including, for example:<br>• An assertion that "Ty elected to leverage off the success and awareness that YooHoo & Friends had created prior to the introduction of the Beanie Boos line;"<br>• An assertion that Cleo and Bubblegum were "positioned as marquee elements" in | April 11, 2011 Supplemental Report of David Drews pp. 4-7, Ex. G.  *See also* Exs. E and F. |

| Uncontroverted Material Fact | Supporting Evidence |
|---|---|
| the marketing of Ty's new Beanie Boos product offering, including in the Header Cards, physical samples of the Beanie Boos, order forms distributed by Ty to retailers, and sale sheets distributed to Ty sales representatives and US retailers;<br><br>• An assertion that the Sale Sheet was "still available for public review" as of the date of the Supplemental Report, "and is still marketing the initial eight Beanie Boos products;"<br><br>• An assertion that "initial retail orders required retailers to purchase a 'Kit' consisting of 12 units of each of the initial eight dolls," so that "virtually every order taken from October 1, 2009 to October 15, 2009, included at least 24 of the Cleo and Bubblegum dolls;"<br><br>• An assertion that "a West Virginia retailer received 12 Cleo and 12 Bubblegum dolls on February 3, 2010, a North Carolina retailer received 12 Cleo dolls in February 2010, and a Texas retailer received one each of the Cleo and Bubblegum dolls;"<br><br>• An assertion that "[e]verything about the marketing of Beanie Boos to the general | |

| Uncontroverted Material Fact | Supporting Evidence |
|---|---|
| public revolves around creating interest in obtaining more Beanie Boos," and that "downstream profits are indirectly related to the initial successful launch of the product line;" and<br>• An assertion that there is "a thriving collector community that strives to collect each of the Beanie Boos." | |
| 18.  In Mr. Drews' April 11, 2011 Supplemental Report, Mr. Drews calculated Ty's profits beyond October and November of 2009. | Deposition of David Drews Vol. 2, taken May 9, 2011 ("Drews Dep.") 238: 1-4, Ex. J; April 11, 2011 Supplemental Report of David Drews p. 2, Ex. G. |
| 19.  Mr. Drews testified that, in connection with his April 11, 2011 Supplemental report, "I was asked to do a calculation of the indirect profits associated with the use of Cleo and Bubblegum on the marketing materials by Ty." | Drews Dep. 235: 6-12, Ex. J. |
| 20.  When asked to describe the basis for his conclusion that there is a causal link between the use of Cleo and Bubblegum and the sales of the other six dolls, Mr. Drews identified three things: (1) the header cards produced by Ty for use by retailers with the product displays that "featured | Drews Dep. pp. 245: 2- 246: 20, Ex. J. *See also* Drews Dep. p. 247: 14-23, Ex. J (Q. Sir, with regard to an actual nexus between Ty's acts and indirect profits, can you tell me, if you would, how did you determine that retailers ordered Ty's Beanie |

| Uncontroverted Material Fact | Supporting Evidence |
|---|---|
| characterizations of the Cleo and Bubblegum dolls;" (2) the sales sheets utilized by Ty account executives and sent to retailers, which "depicted pictures of Cleo and Bubblegum and prominently featured them at the top of the page" with a picture of the display unit of the dolls with Cleo and Bubblegum in the top rack at the front of that rack; and (3) the fact that Ty used Cleo and Bubblegum dolls in face-to-face presentations to potential customers. | Boo kits because of Ty's use of Cleo and Bubblegum? A. Well, they ordered Ty's Beanie Boo kits and Ty's Beanie Boos dolls as a result of the initial sales activity, all of which incorporated the use of Cleo and Bubblegum; the header cards, the sales sheet, the live presentations); Drews Dep. pp. 294: 24 – 295: 7, Ex. J (Q. Was it your goal in fixing this [first] time period one to try and pick up every shipment that was based on an order taken through October 16th? A. It was my intention to capture all of the sales that would have been a result of the marketing materials using Cleo and Bubblegum. So it's not necessarily just the orders prior to October 16th. It's the orders during the period that there was an impact from the use of those marketing materials.); *Id.* p. 296: 10-17, Ex. J ("Q. And why did you choose that [second] damages period? A. Again, there was deposition testimony from one of |

| Uncontroverted Material Fact | Supporting Evidence |
|---|---|
| | the Ty executives that the marketing materials were updated in early December of 2009, and therefore, the impact of those marketing materials that had Cleo and Bubblegum obviously were still out amongst the retailers up through that time period. So conservatively, I cut it off at November 30th."); and *Id.* p. 305: 10-22 Ex. J ("Q. Is there -- we're speaking of time frame three now. You told me that the reason you chose January 31st, 2010, as the cutoff had to do with certain shipments of Beanie Boos toys. Is there any other reason you chose that particular time frame, sir? A. Again, the two main reasons for all of these periods is that I believe that the impact of using Cleo and Bubblegum on the initial set of marketing materials was still in evidence, and I think that the shipment in early February is evidence of that. And obviously, the marketing materials are still |

MEMORANDUM IN OPPOSITION TO AURORA'S MOTION FOR SUMMARY JUDGMENT

| Uncontroverted Material Fact | Supporting Evidence |
|---|---|
| | available today and would have had to have been in place back in February for those orders to be placed and fulfilled.") |
| 21. When asked at his deposition what methodology he used to determine the existence of a causal link, Mr. Drews explained that he identified the marketing actions of Ty involving Cleo and Bubblegum, then calculated profits on Ty's sale of the six non-infringing toys. | Drews Dep. pp. (246:25-248:17) Ex. J (Q.  All right.  So Mr. Drews, what methodology did you use to determine that there was a causal nexus between Ty's activities of Cleo and Bubblegum that you just described and the profits that Ty earned on the remaining six toys that are part of the initial Beanie Boo kit?   A.  The methodology consisted of determining the actions of Ty that I just described in terms of the use of Cleo and Bubblegum in selling all of the initial launch Beanie Boos, and then determining the level of sales associated with those dolls. Once the sales were determined, applying the various expenses that were appropriate to it to determine what the actual profits generated by Ty in terms of the sales of these dolls.) |

| Uncontroverted Material Fact | Supporting Evidence |
|---|---|
| 22.  When asked how he determined that retailers ordered Ty's Beanie Boos kits because of Ty's use of Cleo and Bubblegum, Drews responded as follows: <br><br> "Well, they ordered Ty's Beanie Boos kits and Ty's Beanie Boos dolls as a result of the initial sales activity, all of which incorporated the use of Cleo and Bubblegum; the header cards, the sales sheet, the live presentations." | Drews Dep. p. 247:14-23. |
| 23.  Mr. Drews never spoke with any retailers when drawing his conclusions. | Drews Dep. p. 248:15-17, Ex. J. |
| 24. Mr. Drews did not do anything to determine whether any particular retailer ordered the initial Beanie Boo kits specifically because of Cleo and Bubblegum. | Drews Dep. p. 250:11-15, Ex. J. |
| 25.  Mr. Drews also testified that in order to determine which of the initial eight Beanie Boos was a driver for the majority of Ty's sales of Beanie Boos products, one could conduct a survey, but he did not do so. | Drews Dep. p. 251: 10-18 |
| 26.  Mr. Drews did not personally do any specific analysis to determine why retailers initially ordered Beanie Boos toys. | Drews Dep. p. 264: 23 – 265: 2, Ex. J |
| 27.  Mr. Drews agreed that the ultimate demand for Ty's Beanie Boos toys is eventually driven by consumer demand, as opposed to retailer demand. | Drews Dep. p. 263: 18-21, Ex. J |
| 28.  Mr. Drews admitted that many other | Drews Dep. pp. 309: 17-310:7, Ex. |

| Uncontroverted Material Fact | Supporting Evidence |
|---|---|
| factors influenced Ty's sale of the Beanie Boos kits (other than the presence of Cleo and Bubblegum in Ty's marketing activities).  For example, Mr. Drews admitted at his deposition that Cleo and Bubblegum were not the only reason that retailers ordered the kits, and conceded that he was "sure" that there are "several" other reasons that retailers ordered the Beanie Babies kits. | J. |
| 29. Mr. Drews indicated that it is possible that individual retailers could have ordered the Beanie Boos kits because they liked the Beanie Boo monkey or penguin toy. | Drews Dep. pp. 249:13-250:9, Ex. J. |
| 30.  In his April 11, 2011 Supplemental Report, Mr. Drews rendered an opinion, for the first time, that there were "unaccounted sales" in Ty's inventory of Cleo and Bubblegum toys, and that in the event the Finder of Fact determines that profits from these sales are to be included in the damages owed to Plaintiff relating to the infringement associated with Cleo and Bubblegum, "the profits achieved by Ty during the period from October 1, 2009 through January 31, 2010 that are related to these units total ███ " | April 11, 2011 Supplemental Report of David Drews pp. 2, 13-15, Ex. G. |
| 31.  At his deposition, Mr. Drews testified | Drews Dep. pp. 315: 21 – 316: 7, |

| Uncontroverted Material Fact | Supporting Evidence |
|---|---|
| that these "unaccounted for" sales were in reference to sales of Cleo and Bubblegum toys that were imported into the United States and then sold outside of the country. | Ex. J. |
| 32. In the parties' Final Pretrial Conference Order filed on March 31, 2011, the only statement made by Aurora concerning its claim for direct and indirect profits was as follows:<br><br>"The documents and testimony will show that Ty reaped direct and indirect profits from its efforts in **marketing, displaying, offering for sale, and selling its Cleo and Bubblegum toys in the United States**. Ty prominently marketed and displayed Cleo and Bubblegum in its advertisements. Ty actively marketed the entire Beanie Boo line—including Cleo and Bubblegum—as a kit, in which the whole line was sold as a bundle. Ty required retailers to purchase the entire kit. Ty reaped profits from Beanie Boo kits orders which included Cleo and Bubblegum in the initial order." (Emphasis added.)<br><br>Aurora expressly limited its claim for profits and indirect profits to sales made "in the United States" and said nothing about recovering profits from the sale of Cleo and Bubblegum toys outside of the United States. | [Proposed] Final Pretrial Conference Order, Docket No. 213-1 pp. 10-11. |
| 33. Mr. Drews' May 9, 2011 deposition | Haynie Dec. ¶ 14 Ex. A. |

| Uncontroverted Material Fact | Supporting Evidence |
|---|---|
| was the first time Aurora indicated that it sought to recover profits Ty received from sales of Cleo and Bubblegum toys imported into the United States but sold outside of the country. | |
| 34.  Mr. Drews admitted that he could have included the analysis for this theory of lost profits before, but he "had not realized the significance of it."  He testified:<br><br>Q.  Why did you analyze changes in the inventory levels?<br>A.  Well, it's apparent evidence that Cleo and Bubblegum dolls were imported in the United States and held at a warehouse in the United States.  So the sales of those items even to markets outside of the United States indirectly be [sic] profits that Aurora World should be able to capture as a damage award.<br>Q.  What documents do you base these findings on, sir?<br>A.  It's Bates stamped TY0001604.<br>Q.  Anything else?  Any other documents, rather?<br>A.  That's a series of spreadsheets.<br>Q.  Okay.  Now, you had this particular spreadsheet back when you rendered your January 10, 2011, opinion, correct?<br>A.  Yes.<br>Q.  Why did you not do this analysis before?<br>A.  At that time, I had not realized the significance of it.<br>Q.  So you could have performed this analysis before, but did not, is that fair? | Drews Dep. pp. 315: 25 – 317: 1, Ex. J. |

| Uncontroverted Material Fact | Supporting Evidence |
|---|---|
| A.  It's possible.<br>Q.  But you did not rely on any new documents in rendering this particular opinion on unaccounted for unit sales; right?<br>A.  That's correct. | |
| **IV.    MR. DREWS' BACKGROUND** | |
| 35.  Mr. Drews' background is as a financial analyst primarily concentrated in valuing intellectual property.  He holds a Bachelor of Science degree in business administration/economics from the University of Nebraska. | Appendix A to April 11, 2011 Supplemental Report of David Drews, Ex. G. |
| 36.  Mr. Drews has no training in marketing or consumer behavior. | Appendix A to April 11, 2011 Supplemental Report of David Drews, Ex. G. |
| 37.  Mr. Drews lacks any qualifications to analyze the decisions of retailers and consumers. | Rebuttal Expert Report of Dr. Itamar Simonson par. 28, Ex. I. |
| 38.  Mr. Drews admitted at his deposition that he "would not offer [himself] as an expert on consumer behavior . . .." | Drews Dep. pp. 336: 22 – 337: 3, Ex. J. |
| 39.  Mr. Drews admitted that he lacks the ability, background, and training to predict how an advertisement will be perceived by a given consumer group. | Drews Dep. p. 332: 25 – 333: 10, Ex. J. |
| **V.    TY'S EARLY MARKETING OF CLEO AND BUBBLEGUM** | |
| 40.  When Ty first introduced its Beanie | Declaration of Richard Jeffrey |

| Uncontroverted Material Fact | Supporting Evidence |
|---|---|
| Boos toys in the United States in early October of 2009, Ty sent out a sell sheet to U.S. retailers with images of eight Beanie Boos—Kooky the koala, Kiwi the frog, Bamboo the panda, Waddles the penguin, Coconut the monkey, Slush the husky dog, Cleo the bush baby and Bubblegum the lemur. This mailing went out on October 1, 2009, and this was the only time this sell sheet was mailed out by Ty. | ("Jeffrey Dec.") ¶ 2, Ex. K, and Exhibit 1 thereto. |
| 41. When the Beanie Boos were first introduced, Ty would generally require its retailers other than its National Accounts to order 96 items consisting of 12 each of the eight original Beanie Boos. Ty referred to the set of 96 pieces as a "kit." | Jeffrey Dec. ¶ 12, Ex. K. |
| 42. The top of the sell sheet had an image of a Beanie Babies toy (a dog named "Brutus"), followed by images of the eight original Beanie Boos toys. The images of the Cleo and Bubblegum Beanie Boos were the same size as the images of the other six Beanie Boos toys. | Jeffrey Dec. ¶ 3, Ex. K. |
| 43. Ty's Retailer website had electronic order forms from which Ty retailers and sales representatives could place orders for product. | Jeffrey Dec. ¶ 11, Ex. K. |

| Uncontroverted Material Fact | Supporting Evidence |
|---|---|
| The online order forms could be displayed to the user in two ways: (1) without images of any toys on the order form (for faster loading, which is the default); or (2) with pictures of each toy that was on the order form (a user selected option).  The electronic order form in October of 2009 would have been able to display images of all of the toys on the order form that were then offered for sale, including Cleo and Bubblegum (if the user selected this option).  When images did appear on the order form, the images of Cleo and Bubblegum were the same size as the other toys and were not set apart from the other Beanie Boos toys in any way. | |
| 44.  In mid-October, 2009, Ty decided that it would not sell any Cleo or Bubblegum toys in the United States. They were only to be sold outside the United States. | Jeffrey Dec. ¶ 14, Ex. K. |
| 45.  Accordingly, in October of 2009, Ty shipped all of the kits that had been ordered by U.S. retailers with six characters rather than eight. | Jeffrey Dec. ¶ 15, Ex. K. |
| 46.  By October 15, images of Cleo and Bubblegum had been removed from Ty's online order form. | Jeffrey Dec. ¶ 16, Ex. K. |

| Uncontroverted Material Fact | Supporting Evidence |
|---|---|
| 47.  The October 2009 Beanie Boo Sell Sheet (which is Exhibit 1 of Mr. Drews' April 11, 2011 report), could previously be found at the internet URL http://www.ty-retailers.com/documents/Oct_SellSheet.jpg. This document was put on Ty's internet server at the end of the day on September 30, 2009. | Jeffrey Dec. ¶ 4, Ex. K. |
| 48. The Ty Retailer website is a website designed for use only by Ty authorized retailers.  Authorized Ty retailers must enter their user name and password issued by Ty to gain access to the website homepage at www.ty-retailers.com.  After an authorized retailer logs in to the Ty Retailer website, they have access the Ty Retailer home page with links to other internal pages from the website. | Jeffrey Dec. ¶ 5, Ex. K. |
| 49. In October of 2009, after logging into the Ty Retailer website, retailers would have been able to view the Ty Retailer home page that contained links to other pages within the Ty Retailer website, including a link to the October 2009 sell sheet (at http://www.ty-retailers.com/documents/Oct_SellSheet.jpg) The only place Ty had any link to the October 2009 sell sheet was on the home page of the | Jeffrey Dec. ¶ 6, Ex. K. |

19

| Uncontroverted Material Fact | Supporting Evidence |
|---|---|
| Ty Retailer site in October of 2009.   In order to access the Ty Retailer home page that linked to the October 2009 sell sheet page, a Ty Retailer would have to first log into the Ty Retailer website. | |
| 50. The Ty Retailer website was set up so a retailer could access the October 2009 sell sheet in October of 2009 by logging in and thereafter following the link on the October 2009 Ty Retailer home page to the sales sheet. | Jeffrey Dec. ¶ 8, Ex. K. |
| 51. The link to the October 2009 sell sheet was taken off the Ty Retailer home page shortly after the decision to not ship Cleo and Bubblegum was reached.  Because the link to the sales sheet was taken off the Ty Retailer home page, the page was considered not publicly accessible because no internet user could follow a link and end up at that page. The only way the page could only be accessed if one happened to know the exact URL http://www.ty-retailers.com/documents/Oct_SellSheet.jpg and typed it into an internet browser. | Jeffrey Dec. ¶ 8, Ex. K. |
| 52. Although Ty's home page of the Ty Retailer website is password protected, it was | Jeffrey Dec. ¶ 9, Ex. K. |

| Uncontroverted Material Fact | Supporting Evidence |
|---|---|
| possible until recently for a member of the public to go directly to the image of the October 2009 sales sheet  by typing in the exact URL http://www.ty-retailers.com/documents/Oct_SellSheet.jpg. | |
| 53. The October 2009 sell sheet image has now been removed from Ty Retailer Website. | Jeffrey Dec. ¶ 10, Ex. K. |
| 54. Ty's Retailer website had electronic order forms from which Ty retailers and sales representatives could place orders for product. The online order forms could be displayed to the user in two ways: (1) without images of any toys on the order form (for faster loading, which is the default); or (2) with pictures of each toy that was on the order form (a user selected option).  The electronic order form in October of 2009 would have been able to display images of all of the toys on the order form that were then offered for sale, including Cleo and Bubblegum (if the user selected this option).  When images did appear on the order form, the images of Cleo and Bubblegum were the same size as the other toys and were not set apart from the other Beanie Boos toys in any way. | Jeffrey Dec. ¶ 11, Ex. K. |
| 55. Mr. Drews admitted that he was | Drews Dep. pp. 297: 13-23, Ex. J. |

| Uncontroverted Material Fact | Supporting Evidence |
|---|---|
| provided a copy of the Ty sell sheet which he references in his expert report and then typed in the URL address at the bottom of the page in order to find the document online. | |
| 56.  Mr. Drews did not log onto Ty's website to see the sell sheet and he is unaware of any link on the internet that one can click in order to arrive at the URL for the Ty sell sheet, and he is unaware of whether the URL can be found by any search engine.  He did not try to search for this particular sales sheet by using a search engine on the internet. | Drews Dep. pp. 298: 24 – 299: 22, Ex. J. |
| **VI.     TY'S ORDERS AND RETURNS FOR THE INITIAL BEANIE BOOS** | |
| 57.  Although Ty's field accounts were required to purchase a "kit" consisting of 12 units each of the initial eight Beanie Boos plush animals, Ty's National Account customers were free to place initial orders for individual plush animals. | Second Supplemental Expert Rebuttal Report and Disclosure of Glenn A. Dalhart pp. 5-6, Ex. H; Jeffrey Dec. ¶ 13, Ex. K. |
| 58.  During the period from October 1, 2009 to October 15, 2009, ██% of all Beanie Boos sales (██████ Beanie Boos toys valued at $██████) were purchased as kits, and ██% of all Beanie Boos sales (██████ Beanie Boos toys valued at $██████) were purchased as | Second Supplemental Expert Rebuttal Report and Disclosure of Glenn A. Dalhart p. 6, Ex. H. |

MEMORANDUM IN OPPOSITION TO AURORA'S MOTION FOR SUMMARY JUDGMENT

| Uncontroverted Material Fact | Supporting Evidence |
|---|---|
| individual items. | |
| 59.  The launch order pattern of the Ty National Accounts, which were allowed to purchase Beanie Boos individually, does not demonstrate any preference for Cleo or Bubblegum Beanie Boos toys over the other six Beanie Boos toys offered at the same time, as illustrated in the following chart: <br><br> *(chart with columns Item #, Name, Quantity Ordered ( ), %)* <br> 36000 Cleo <br> 36001 Kooky <br> 36003 Coconut <br> 36004 Kiwi <br> 36005 Bamboo <br> 36006 Slush <br> 36007 Bubblegum <br> 36008 Waddles <br> Totals | Second Supplemental Expert Rebuttal Report and Disclosure of Glenn A. Dalhart p. 7, Ex. H. |
| 60.  In connection with the six Beanie Boos products that were shipped as kits beginning with the launch of the product line on October 1, 2009 and ending December 31, 2009, only 36 units were returned during the month of October out of a total of 105,135 units shipped, and returns as a percentage of shipments averaged 0.69% for the three months following introduction.  Return numbers were also fairly consistent across individual item numbers. | Second Supplemental Expert Rebuttal Report and Disclosure of Glenn A. Dalhart p. 7 and Ex. 5 thereto, Ex. H. |

| Uncontroverted Material Fact | Supporting Evidence |
|---|---|
| 61.  The return figures as a percent of shipments for Ty's entire Beanie Boos product line for the following three time periods were as follows:<br>• October 2009 – July 2010:  ██%<br>• August 2010 – November 2010:  ██%<br>• October 2009 – November 2010:  ██% | Second Supplemental Expert Rebuttal Report and Disclosure of Glenn A. Dalhart p. 7 and Ex. 5 thereto, Ex. H. |
| 62.  The returns data suggests that there was no negative customer reaction to Ty's decision not to ship Cleo or Bubblegum as part of the Beanie Boos product line. | Second Supplemental Expert Rebuttal Report and Disclosure of Glenn A. Dalhart p. 7, Ex. H. |
| 63.  If Cleo and Bubblegum were more important than the other Beanie Boos plush animals, then the elimination of Cleo and Bubblegum from the product line likely would have resulted in higher than normal returns in the period following the announcement that Cleo and Bubblegum would not be shipped by Ty.  The data suggests that return activity was normal during this time and suggests that Ty's customers did not consider Cleo and Bubblegum any more important than the other plush animals in the Beanie Boos product line. | Second Supplemental Expert Rebuttal Report and Disclosure of Glenn A. Dalhart p. 8, Ex. H; Rebuttal Expert Report of Dr. Itamar Simonson par. 23, Ex. I. |
| 64.  The individual Beanie Boos sales data | Second Supplemental Expert |

MEMORANDUM IN OPPOSITION TO AURORA'S MOTION FOR SUMMARY JUDGMENT

| Uncontroverted Material Fact | Supporting Evidence |
|---|---|
| shows that the supply chain for these toys is driven primarily by end consumer purchases of the particular items at retail.  This is demonstrated by the fact that Ty's customers were purchasing more of some toys than others.  For example, by the fourth month after their introduction, Ty shipped noticeably fewer Kooky koala and Kiwi frog toys than the other four, and these two items were ultimately far less successful than the other four introductory Beanie Boo items.  Even among the most successful introductory Beanie Boos, there is as much as a 25% difference in cumulative shipments through the fourteen months following introduction. | Rebuttal Report and Disclosure of Glenn A. Dalhart pp. 8-9 and Exs. 6 and 7 thereto, Ex. H. |
| 65.  The presence of Cleo and Bubblegum in Ty's introductory product line had nothing to do with consumer purchases of the individual Beanie Boos toys at retail.  With one minor exception, Cleo and Bubblegum were not shipped to retailers and therefore consumers were unable to purchase these toys at retail point of sale.  Cleo and Bubblegum could not have had any impact, either direct or indirect, on consumers' purchase of Ty's Beanie Boos. | Second Supplemental Expert Rebuttal Report and Disclosure of Glenn A. Dalhart p. 10, Ex. H. |

| Uncontroverted Material Fact | Supporting Evidence |
|---|---|
| 66. A comparison of the customers who purchased Beanie Boos toys from Ty from October 1, 2009 to July 31, 2010, with the customers who purchased YooHoo & Friends toys from Aurora from early 2007 through March 31, 2010, indicates that Aurora and Ty had approximately ██████████ ████████████ ██████████████ ███████████ ██████████████ █████████████ ████████████ overlap of Ty's customer list. | Second Supplemental Expert Rebuttal Report and Disclosure of Glenn A. Dalhart p. 5, Ex. H. |
| 67. An analysis of the top 50 customers who purchased YooHoo & Friends from Aurora from early 2007 through March 31, 2010 and who purchased Beanie Boos from Ty from October 31, 2009 through July 31, 2010, indicates that ███████ ████████████ ███████████ ██████████████ █████████ ████████ ████████ | Second Supplemental Expert Rebuttal Report and Disclosure of Glenn A. Dalhart p. 5, Ex. H. |

| Uncontroverted Material Fact | Supporting Evidence |
| --- | --- |
| ███████████████████████████████ ██████████████████████████ ████████████. | |
| 68.  The very small percentage of common customers between Aurora and Ty indicates that Ty did not leverage off the success and awareness of Aurora's YooHoo & Friends product line. | Second Supplemental Expert Rebuttal Report and Disclosure of Glenn A. Dalhart p. 5, Ex. H. |
| **VII.   EXPERT OPINION OF ITAMAR SIMONSON** | |
| 69.  Counsel for Ty asked Dr. Itamar Simonson to review the "causal link" conclusion relied upon in the Supplemental Report of Mr. Drews, i.e., that Ty's inclusion of the Cleo and Bubblegum dolls in the initial offering of eight Beanie Boos toys has been the cause or main driver of sales of the remaining six dolls since the product line's launch. | Rebuttal Expert Report of Dr. Itamar Simonson par. 12, Ex. I. |
| 70.  Dr. Simonson is a Professor of Marketing at the Graduate School of Business, Stanford University.  He holds a Ph.D. in Marketing from Duke University, an MBA from UCLA, and a Bachelor's degree from The Hebrew University.  His field of expertise is consumer behavior, marketing | Rebuttal Expert Report of Dr. Itamar Simonson pars. 1-11, Ex. I. |

| Uncontroverted Material Fact | Supporting Evidence |
|---|---|
| management, trademark infringement from the consumer's perspective, survey methods, and human judgment and decision making. He has received several awards in his field of expertise, published dozens of articles, and conducted, supervised or evaluated over 1,000 marketing research surveys, including many related to consumer behavior and advertising-related issues. | |
| 71.  Dr. Simonson concluded that Ty's use of the Cleo and Bubblegum dolls on sales sheets, on header cards on displays, and the use of the dolls in sales meetings did not cause customers to buy other Beanie Boos dolls, and that Mr. Drews' theory that the use of the Bubblegum and Cleo dolls on the initial sales sheet was the driver of the Beanie Boos success ever since and the key determinant of the decision of the ultimate consumers to buy Beanie Boos is inconsistent with basic principles of marketing and consumer behavior, lacks any basis, and is not supported by any evidence. | Rebuttal Expert Report of Dr. Itamar Simonson pars. 28-29, Ex. I. |
| 72.  The demand of retailers for a product is derived from the demand of the retailers' customers (i.e., consumer demand), which is | Rebuttal Expert Report of Dr. Itamar Simonson par. 18, Ex. I. |

| Uncontroverted Material Fact | Supporting Evidence |
|---|---|
| known in the marketing field as "derived demand."  Thus, retailers order products based on their sales of these products to their customers.  In the present context, a retailer reorders specific dolls on the basis of the sales of that particular doll. | |
| 73.  The demand for each doll depends on its characteristics and the users' tastes.  Consumer demand does not depend on the list of dolls that happened to be included in a sales sheet that was distributed to retailers. | Rebuttal Expert Report of Dr. Itamar Simonson par. 19, Ex. I. |
| 74.  Dr. Simonson concluded that the fact that Ty decided not to ship Cleo or Bubblegum dolls almost immediately after their introduction means that these dolls have had no impact whatsoever on subsequent sales of the other Beanie Boos dolls. | Rebuttal Expert Report of Dr. Itamar Simonson par. 19, Ex. I. |
| 75.  The principle that consumer demand for each Beanie Boos doll depends on its specific features is illustrated in the present case by the great variability in the level of sales of the Beanie Boos dolls at issue.  For instance, toys such as "Coconut" and "Waddles" have been very popular with consumers whereas others, such as "Ghosty," and "Blueberry" have been much less | Rebuttal Expert Report of Dr. Itamar Simonson par. 20, Ex. I. |

| Uncontroverted Material Fact | Supporting Evidence |
|---|---|
| popular.  Retailers typically track the sales levels of different products and order new supplies accordingly (i.e., their demand for specific dolls is derived from consumers' purchases of these dolls). | |
| 76.  Dr. Simonson concluded that there is no logical or factual basis for Drews' conclusion that including Bubblegum and Cleo toys on Ty's initial sales sheet sent to retailers caused consumers to start collecting Beanie Boos dolls.  He also stated that it was "hard to understand" how two dolls that consumers did not see or buy could possibly drive their (presumed) decision to collect dolls. | Rebuttal Expert Report of Dr. Itamar Simonson par. 22, Ex. I. |
| 77.  When deciding whether to sell a particular product line, two of the key factors that the retailer is likely to consider include the expected sales of the product and the relationship with the vendor. | Rebuttal Expert Report of Dr. Itamar Simonson par. 24, Ex. I. |
| 78.  Most retailers (both chains and independent stores) have been selling Ty's products for several years.  In particular, the Beanie Babies have been a very successful product line, and although sales have declined, it remains a popular product line | Rebuttal Expert Report of Dr. Itamar Simonson par. 24, Ex. I. |

| Uncontroverted Material Fact | Supporting Evidence |
|---|---|
| with substantial sales.  Established Ty retailers typically order new product lines from Ty when these product lines are introduced, and such retailers have had experience selling other Ty product lines, such as the Beanie Ballz dolls. | |
| 79.  Based on Ty's record of selling successful products and being a reliable partner of retailers, the company has likely built a strong relationship and credibility with retailers.  The fact that retailers typically order new product lines from Ty when these product lines are introduced indicates that Ty's customers have had positive experiences selling Ty's products and they trust the company. Partnering and building strong relationships with resellers is an essential driver of market success.  Such relationships are largely based on the vendor's prior record in terms of sales (e.g., the success of previously introduced products) and reliability. | Rebuttal Expert Report of Dr. Itamar Simonson par. 25, Ex. I. |
| 80.  Partnering and building strong relationships with resellers is an essential driver of market success.  Such relationships are largely based on the vendor's prior record | Rebuttal Expert Report of Dr. Itamar Simonson par. 25, Ex. I. |

MEMORANDUM IN OPPOSITION TO AURORA'S MOTION FOR SUMMARY JUDGMENT

| Uncontroverted Material Fact | Supporting Evidence |
|---|---|
| in terms of sales (e.g., the success of previously introduced products) and reliability. | |
| 81.  Based on Ty's prior success with the Beanie Babies and other product lines, Ty's retailers were likely to be receptive to new product lines that Ty launches.  It is extremely unlikely that any retailer's decision to distribute a new product line was influenced by or dependent on other manufacturers'' toys that lack any unique consumer recognition or established equity, or the insignificant recognition of the YooHoo & Friends line (which lacks any secondary meaning). | Rebuttal Expert Report of Dr. Itamar Simonson par. 26, Ex. I. |
| 82.  Dr. Simonson concluded that it is highly unlikely that the inclusion of the Bubblegum and Cleo dolls played any role in the initial decision of retailers to distribute the Beanie Boos line nor has it influenced their decisions to continue purchasing the Beanie Boos dolls. | Rebuttal Expert Report of Dr. Itamar Simonson par. 26, Ex. I. |
| 83.  There is nothing about Ty's use of images of Cleo and Bubblegum on a sell sheet, in header cards attached to displays, or its use of physical dolls in sales presentations to indicate that these dolls were more or less | Rebuttal Expert Report of Dr. Itamar Simonson par. 27, Ex. I. |

| Uncontroverted Material Fact | Supporting Evidence |
|---|---|
| important than any other dolls in the Beanie Boos line. | |
| 84.  Cleo and Bubblegum were two dolls in an eight-doll lineup and were not specifically highlighted over any other toy. From a marketing impact standpoint, the images of Cleo and Bubblegum dolls in the initial Beanie Boos sales sheet are not larger or set apart from any of the other six dolls on the sheet. | Rebuttal Expert Report of Dr. Itamar Simonson par. 27, Ex. I. |
| 85. The depiction of the Cleo and Bubblegum dolls on the top of header card displays does not make these toys more important than the other Beanie Boos, among other reasons, because the drawings are cartoons and do not accurately show the dolls, and because the Cleo and Bubblegum dolls were not shipped to retailers. | Rebuttal Expert Report of Dr. Itamar Simonson par. 27, Ex. I. |
| 86.  According to a consumer survey conducted on behalf of Ty, the appearance of Aurora's YooHoo & Friends toys has no acquired distinctiveness and no secondary meaning. | Order Granting in Part and Denying in Part Defendant Ty's Motion for Summary Judgment, Docket No. 162 pp. 18-19. |
| 87.  In its Order Granting in Part and Denying in Part Defendant Ty's Motion for | Order Granting in Part and Denying in Part Defendant Ty's Motion for |

| Uncontroverted Material Fact | Supporting Evidence |
|---|---|
| Summary Judgment, this Court ruled that Aurora lacks secondary meaning in its YooHoo & Friends toys as a matter of law.  In so ruling, this Court described the "basic element" of secondary  meaning as ""the mental association by a substantial segment of consumers and potential consumers' with a single source of the product." | Summary Judgment, Docket No. 162 pp. 59-64. |
| 88.   There is no basis for the notion that the Bubblegum and Cleo dolls were perceived by consumers as particularly attractive or unique, allegedly due to their resemblance to the YooHoo & Friends dolls, since the YooHoo dolls have not acquired secondary meaning or recognition. | Rebuttal Expert Report of Dr. Itamar Simonson par. 21, Ex. I. |
| 89.   Any suggestion that the alleged similarity of the Beanie Boos dolls to the YooHoo dolls has contributed (or caused) the sales of the former due to the recognition or brand equity of the YooHoo dolls is not supported by the facts. | Rebuttal Expert Report of Dr. Itamar Simonson par. 21, Ex. I. |

## PART 2 – CONCLUSIONS OF LAW

1.   This Court may render judgment in favor of Ty as a matter of law if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  The proper inquiry is "whether the evidence presents a sufficient disagreement to require the submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby Inc*., 477 U.S. 242, 252 (1986).

2.  Rule 56(c) mandates the entry of summary judgment where, as here, a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

3.  To survive summary judgment on its demand for indirect profits, Aurora "must proffer sufficient non-speculative evidence to support a causal relationship between the infringement and the profits generated indirectly from such an infringement."  *Mackie v. Rieser*, 296 F.3d 909, 916 (9th Cir. 2002) (affirming summary judgment in favor of copyright defendant where plaintiff "did not articulate a non-speculative correlation" between the infringement and subsequent revenues).

4.  Before the question can go to the jury, this Court "must conduct a threshold inquiry into whether there is a legally sufficient causal link between the infringement and subsequent indirect profits."  *Id*. at 915.

5.  Aurora has failed to present a non-speculative correlation between Ty's allegedly infringing conduct and Ty's profits from the six non-infringing toys.

6.  Under section 504(b) of the Copyright Act, a copyright owner is entitled to recover, in addition to actual damages, "any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages.  17 U.S.C. § 504(b).

7.  A district court may deny recovery of a defendant's profits "if they are only remotely or speculatively attributable to the infringement."  *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc*., 772 F.2d 505, 517 (9th Cir. 1985), citing 3 M. Nimmer, *Nimmer on Copyright*, § 14.03[A] at 14-15 (1985).

8.  This Court has already ruled that the three categories of conduct cited by Drews do not infringe Aurora's claimed copyrights.  In its Order Granting in Part and Denying in Part Ty's Motion for Summary Judgment, this Court ruled, as a matter of law, that "Ty [was] entitled to summary judgment on the claim that it infringed Aurora's right to display" by "*introducing Cleo and Bubblegum to retailers* and *using sales sheets* and *'Header Cards' with the toys' likenesses on them*." (Docket No. 162 p. 51, emphasis added.)

9.  As a result, Aurora cannot claim indirect profits based on these non-infringing activities.  *See Polar Bear Production, Inc. v. Timex Corp.*, 384 F.3d 700, 713 (9th Cir. 2004) (reversing award of indirect profits where substantial evidence did not "support the required causal link between the infringement and the revenue derived from enhanced brand prestige").

10. The only allegedly infringing activity that remains to be tried is Ty's limited sale of Cleo and Bubblegum toys in the United States.  Accordingly, this is the only conduct on which a claim for indirect profits can be based.

11.  In *Mackie*, the Ninth Circuit upheld a summary judgment for defendant on the plaintiff's claim for indirect profits under comparable facts.  In that case, the defendant Symphony used a photograph of plaintiff's artwork in a brochure for its upcoming season, and plaintiff sought a portion of plaintiff's profits from its symphony performances as a measure of indirect damages.  The district court rejected this theory as a matter of law as being too speculative, and the Ninth Circuit affirmed, because intuitively, it could "surmise virtually endless permutations to account for an individual's decision to subscribe to the Pops series, reasons that have nothing to do with the artwork in question."  296 F.3d at 916.  The court rejected the expert's opinion, concluding that "[r]ank speculation of that sort will not allow a copyright holder to survive a summary judgment motion on his claim for indirect profits." *Id.*

12.   There are endless reasons why Ty's retailers could have chosen to purchase the initial six Beanie Boos toys, none of which had anything to do with Cleo or Bubblegum.

13.   In *Polar Bear*, the Ninth Circuit reversed a jury's award of indirect profits because the court concluded "as a matter of law" that evidence of the requisite causal connection was "woefully insufficient" and the plaintiff's theory "stretche[d] the causation rubber band to its breaking point."  384 F.3d at 714.  In that case, the defendant used plaintiff's copyrighted film to promote its watches, and sought defendant's profits from the sale of the watches. The award of indirect profits was vacated because "no evidence establishe[d] that the infringement may have actually influenced the purchasing decisions of those that bought Timex's watches at retail stores or other outlets—the decisions that lead to increased sales revenue, which is the foundation of profits recoverable under § 504(b)."  *Id*. at 714-175.  Because the infringing images were only shown at trade shows, "actual retail purchasers were never exposed to the infringing images . . . ."  *Id*.  The Ninth Circuit concluded that "too many question marks remain[ed] between the promotional infringement, the purported enthusiasm generated among wholesalers and retailers by the advertising, the increased profits, and Timex's ultimate profits."  *Id*. at 715.

14.   The actual purchasers of the Beanie Boos were never exposed to the marketing materials (other than perhaps the header cards) that form the basis for Aurora's claim for indirect profits, and "too many question marks remain" between Ty's conduct in connection with its very limited use of Cleo and Bubblegum and the sale of the six unrelated Beanie Boos toys for which indirect profits are sought.  *See also May v. Watt*, 822 F.2d 896 (9th Cir. 1987) (upholding directed verdict in favor of copyright defendant on plaintiff's claim for indirect profits); *Masterson Marketing, Inc. v. KSL Recreation Corp.*, 495 F.Supp.2d 1044 (S.D. Cal. 2007) (summary judgment for defendant on plaintiff's claim for indirect profits where "Plaintiff has provided no non-speculative evidence concerning a causal relationship

between the alleged infringing use of his images in E&H defendants' advertising and an increate [in] the KSL defendants' profits."); and *Lowrey's Reports, Inc. v. Legg Mason, Inc.*, 271 F. Supp. 2d 727, 752 (D. Md. 2003) ("The complex, variable, independent thought processes of hundreds of individual brokers intervene between the copying and any subsequent gain.  Lowry's has articulated no more than a speculative correlation.  It is utterly implausible that *all* of Legg Mason's profits resulted from its infringing use of the *Reports*. . . . Accordingly, Lowry's claim for Legg Mason's profits must fail").

15.  Before admitting expert testimony, the trial court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 592-93 (1993).  As the party offering the expert, Aurora "bears the burden of establishing that Rule 702 is satisfied." *Sundance Image Tech., Inc. v. Cone Editions Press, Ltd.,* No. CV 02-2258 JM (AJB), 2007 WL 935703, *4 (S.D. Cal. Mar. 7, 2007).  The trial court should exclude from its summary judgment consideration proffered expert testimony that is not reliable.  *Claar v. Burlington Northern R.R.,* 29 F.3d 499, 502-05 (9th Cir. 1994).

16.  Mr. Drews fails to articulate any reliable principles or methods that underlie his "causal nexus" conclusion, and his opinion in this regard should therefore be rejected. *See, e.g.  Masterson Mktg. v. KSL Rec. Corp.*, 495 F. Supp. 2d 1044, 1050 (S.D. Cal. 2007) (Before admitting expert testimony on summary judgment, "the Court must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted. The expert's testimony must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded").

17.  The relevant tests to determine whether Mr. Drews' analysis is the product of a reliable principle or method include : (1) whether the technique can be or has been

tested; (2) whether his theory or technique has been published and subjected to peer review; (3) the known or potential rate of error experienced in the application of the particular technique; (4) the existence of standards and controls for the application of the technique the witness applied and whether the witness applied these standards and controls; or (5) whether the theory or technique is generally accepted in a definable relevant community of experts.  4 *Weinstein's Federal Evidence* at §702.05[2][c].

18.  The fact that Mr. Drews' methodology lacks any ability to be tested for accuracy suggests the Court should exclude it here.  *See, e.g. O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090, 1106-1107 (7th Cir 1994) (ophthalmologist's proposed testimony that a person's cataract was caused by nuclear radiation excluded as unreliable when testimony was based solely on witness's visual observation of cataracts; witness provided no scientific support for hypothesis that radiation-induced cataracts could be identified by informed observation, and other experts indicated that diagnosis could not be made without medical work-up, study of patient's medical history, and review of dosimeter charts.)

19.  Mr. Drews' opinion is also inadmissible because he failed to apply principles and methods reliably to the facts of the case pursuant to  Fed.R.Evid. 702(3). *McCorvey v. Baxter Healthcare Corp.,* 298 F.3d 1253, 1256-57 (11th Cir. 2002) (engineering expert's testimony was properly excluded as unreliable in strict product liability action against catheter manufacturer because expert did not test alternative designs for catheters and did not consider or test for failure that could have come from sources outside the product at issue.)

20.  The fact that Mr. Drews does not try to explain the impact of the other factors that influenced the purchase of the initial Beanie Boos toys calls into question Mr. Drews' "causal nexus" conclusion and also demonstrates that Mr. Drews "offers nothing more than speculative arguments and figures to support plaintiff's conclusion of a causal relationship between the infringement and the indirect profits." *Masterson*

*Mktg,* 495 F. Supp. 2d at 1051("Plaintiff, as a purported expert, does not offer any explanation for or means of determining how those other factors impact revenue for the Resort vis-a-vis the use of his images which calls into question plaintiff's conclusion that there is any nexus between the use of his images and the KSL defendants' profits. Plaintiff's expert report offers nothing more than speculative arguments and figures to support plaintiff's conclusion of a causal relationship between the infringement and the indirect profits generated by the E&H defendants for the KSL defendants.)

21.  A supplemental expert report that states additional opinions or seeks to strengthen or deepen opinions expressed in the original expert report is beyond the scope of proper supplementation and subject to exclusion under Rule 37(c).  *Plumley v. Mockett*, 2010 U.S. Dist. LEXIS 57254 (C.D. Cal. May 26, 2010).

Dated:  May 20, 2011          CONNOLLY BOVE LODGE & HUTZ LLP

                              HUSCH BLACKWELL LLP

                              SCANDAGLIA & RYAN

                              By:    /s/ Laurie Haynie
                              _____

                              Attorneys for Defendant and Counterclaimant
                              Ty Inc.